**ZURICH INSURANCE COMPANY,**
**Plaintiff,**

v.

**Samuel Earl OGLESBY, Lola Mae Jefferson Peters, Samuel R. Hutcherson, Jr., Insurance Company of North America, a Pennsylvania Corporation, Defendants.**

**Civ. A. No. 574.**

United States District Court
W. D. Virginia,
Lynchburg Division.

April 24, 1963.

Floyd C. Jennings, Jr., Lynchburg, Va., for Zurich Ins. Co.

J. Frank Shepherd, and Edward J. Hotchkiss, Jr., Lynchburg, Va., for Samuel Earl Oglesby.

S. J. Thompson, Jr., Lynchburg, Va., for Insurance Co. of North America, Lola Mae Jefferson Peters and Samuel R. Hutcherson, Jr.

MICHIE, District Judge.

Sam Hutcherson and Lola Mae Jefferson Peters were going steady. They could not get married because Lola Mae was married to one Peters and it was not, as was stated in evidence, "practical" for her to get a divorce and marry Sam. (I learn from counsel, dehors the record, that the reason it was not practical for her to do so was that Peters was in the army and had been required to make an allotment to Lola Mae and hence, as long as that allotment money kept coming in, it would not have been "practical" for her to get a divorce since the divorce would have terminated the allotment.) At any rate the impression is given by the evidence that Lola Mae and Sam regarded each other substantially as if they were husband and wife.

Sam owned a taxicab in Lynchburg, Virginia, and at one time had owned as many as three taxicabs. He and Lola Mae did a certain amount of driving around the state together for pleasure and found that driving in his taxicab was not as comfortable as driving in an ordinary passenger car. Consequently they conceived the idea of purchasing such a car.

Lola Mae had saved up about $300.00 and they went out to Amherst Motors in Amherst, Virginia, and picked out a car which could be purchased for a down payment of $300.00. They intended that Lola Mae should buy the car in her own name but Amherst Motors decided that her credit was not good enough and refused to sell to her. They said that they would sell to Sam so Lola put up her $300.00 and Amherst Motors transferred title to the car to Sam.

Sam had had extensive dealings through the years with Ivey and Kirkpatrick, an insurance agency in Lynchburg which represented Zurich Insurance Company, the plaintiff in this case. On July 18, 1961 Sam went into Ivey and Kirkpatrick with his contract of purchase and stated that he wanted insurance on the car. The person with whom he dealt usually at Ivey and Kirkpatrick was out. However Sam was well known to many of the employees at Ivey and Kirkpatrick and one of these, a Mrs. Sue Baker, undertook to serve him. However it was approaching Mrs. Baker's lunch hour. Mrs. Baker started in on the work for Sam and there is a sharp conflict of testimony between Mrs. Baker and Sam as to what occurred.

Mrs. Baker filled out an application form and she testified that she read out loud to Sam every question on the form and wrote down his answers. Sam, on the other hand, testified that she read no questions to him and asked him only a few unimportant questions such as whether he was still in the cab business and where the deferred payments were to be made. And this is entirely credible as Sam was well known in the agency and most of the information, except for the number and make of the car which were obtainable from the contract of sale, was already available in the files of the agency. Mrs. Baker similarly testified that she read Sam questions from a safe-driver's form and filled them in from his answers. But Sam says that he signed that form in blank. He never signed the application form though there was a space provided on it for the applicant's signature. Mrs. Baker and other witnesses for the plaintiff testified, however, that it was not customary to require the applicant to sign the form.

Two questions, one from the application form and one from the safe-driver form, are crucial in this case. In the application form there is a question:

"Except for husband and wife joint ownership, bailment lease, conditional sale, purchase agreement, mortgage or other encumbrance, is Applicant sole owner of the automobile?"

This question was answered "yes" on the application. But Sam denies that he was ever asked the question.

On the safe-driver form the following question appears:

"Has the applicant or the principal operator of any automobile to be insured been licensed to operate an

automobile for less than three years?"

This question was answered "no". Sam says the question was never asked him and that he signed that form in blank.

At the time of the purchase of the car Lola Mae had never driven a car and she did not begin to take driving lessons until some months later. She did take some driving lessons in the late summer months after the purchase of the car and she did undertake to drive the car by herself then or shortly thereafter for on October 16, 1961 she, driving the car alone, but still without a license to drive, was involved in a minor accident.

Lola Mae was taken into traffic court for driving without a license and fined. Shortly thereafter she reported the accident to Ivey and Kirkpatrick and they paid the damages involved. A few days later Sam happened to meet on the street a Mrs. Weinstein of Ivey and Kirkpatrick through whom most of his relations with the agency through the years had been carried on. They chatted about the accident and Mrs. Weinstein remarked that Lola Mae should not have told Mrs. Johnson (the representative of the agency with whom she talked) that she actually owned the car as this had upset Mr. Singleton, the head of the agency.

In the meantime Lola Mae was making payments fairly regularly to the bank which had bought the deferred payment contract from Amherst Motors, though occasionally she was unable to do so and Sam then made those payments. On March 16, 1962 Lola, having in the meantime secured her driver's license, was involved in another accident driving the car, this time injuring one Samuel Earl Oglesby.

When the insurance policy was purchased Sam was not in a position to pay for it in full and it was issued partly on a credit basis. He made payments from time to time and the final payment was made and accepted by Ivey and Kirkpatrick in May of 1962, approximately two months after Lola Mae's second ac-

cident had been reported to them. (The plaintiff claims that this was merely the last payment on an open account but an analysis of the account clearly shows that all items had previously been paid except the balance on this policy.)

Oglesby brought suit against Lola Mae in the Circuit Court of the City of Lynchburg. The Zurich Insurance Company then brought this action in this court against Oglesby, Lola Mae and Sam and the Insurance Company of North America (Mr. Oglesby's uninsured motorist carrier), asking for a declaratory judgment to the effect that it was not bound to defend the Oglesby action or to pay any judgment obtained therein because of the alleged false statements made by Sam in obtaining the policy.

Zurich sought a temporary injunction against prosecution of the Oglesby suit until its liability on the policy issued to Sam could be ascertained in this suit and such a temporary injunction was granted.

Zurich's claim in this suit is that it is not bound on the policy because the answers to the two questions mentioned above as to ownership and principal operation of the automobile were false and therefore avoided the policy.

Several questions are involved:

(1) Did Sam make the statements that Mrs. Baker says he made?

(2) If so, were they false? and

(3) If so, do not the facts, including the acceptance of premiums long after the facts were known, constitute a waiver of Zurich's right to avoid the policy?

I believe that the first two questions should clearly be answered in the negative and therefore I do not think that I will take up the third question.

We have a direct conflict of evidence between Sam and Mrs. Baker as to whether she asked the questions and received the answers that raise the issue in this case. The plaintiff Zurich

must prove that the questions were asked and so answered by a preponderance of the evidence. I do not believe that it has done so. Ordinarily if two witnesses equally credible testify in contradiction of each other the evidence, in the absence of other circumstances pointing in one direction or another, is in equipoise and the plaintiff has not proved his case. It may be argued that Mrs. Baker was disinterested and that Sam was interested. On the other hand Sam has no financial interest in the outcome of this lawsuit. He has lost his license as a result of the car which was titled in his name being involved in an accident in which insurance coverage is denied and does stand to get his license back if the coverage does in fact exist. But there is no suggestion that he could, by any possibility, be held liable to Mr. Oglesby for this injury.

Furthermore Sam's recollection of what took place is probably much clearer than that of Mrs. Baker. Mrs. Baker is handling such matters daily and has been for thirty-three years. She probably does not have much reason to remember one application from another. Sam on the other hand has applied for automobile insurance only a relatively few times. Also Mrs. Baker and Sam were both in a hurry. He had parked by a thirty-minute parking meter. Mrs. Baker's lunch hour was approaching and a lady who was lunching with her was waiting and Mrs. Baker actually left without going through some of the final routine of the office, leaving a Mrs. Smith, who came in from her lunch, to conclude the matter.

Moreover it is inherently improbable that Mrs. Baker actually read to Sam the questions for which she already knew the answers. Some of these questions are:

"Has applicant * * * or any person who customarily or frequently operates the automobile:

"(1) Had automobile insurance cancelled or refused or received notice from any insurer of an intent to cancel or refuse such insurance within the past three years?

"(2) Had driver's license revoked, suspended, restricted or refused within the past three years?

\* \* \* \* \* \*

"(5) Any physical impairment or deficiency?

"If applicant is a farmer, is any customary operator engaged in any other occupation?"

The foregoing would all have been within Mrs. Baker's knowledge as far as Sam was concerned and as she had no knowledge that anyone else was interested in the car she almost certainly would not have read the questions.

Another question was:

"Estimate yearly mileage of automobile for all types of driving:"

This question was not answered on the completed form.

Still another question was:

"Are there any drivers who do not speak, read or understand English?"

It seems most improbable that this question would actually have been asked of Sam.

Furthermore it may be doubted that Mrs. Baker is entirely disinterested in the matter. If she did put down, without making proper inquiry, information which she thought she knew she at least loses some standing with the agency by which she has been employed for so many years.

I must add that I was impressed throughout by Sam's careful and candid testimony. There was no attempt at evasion or effort to cover up anywhere when he was questioned. He answered all questions frankly and without hesitation. I certainly feel that I must give his testimony at least equal weight, if not greater weight, than the testimony of Mrs. Baker and that being the case I must conclude that Sam did not make the allegedly false statements which were put down in the application and in the safe-driver's application but that Mrs.

Baker put them down because she felt morally certain that they were true even though she did not ask the questions.

It is true that Sam signed the safe-driver's application form. But he testifies that it was in blank when he signed it and I accept his testimony.

Even if Sam did make the statements they were not false.

The question involved on the safe-driver's application was "Has the applicant or the principal operator of any automobile to be insured been licensed to operate an automobile for less than three years?" This was answered "no." Sam had been licensed for more than three years. Lola Mae had no license and therefore could not drive the car and did not begin to take driving lessons until several months after the car was purchased. There is no evidence that at the time the car was purchased she expected to take driving lessons. If so, why the delay of several months? It is obvious therefore that this answer was not false. And as a matter of fact the only evidence as to the relative use of the car by Sam and Lola, respectively, over the period of ownership was to the effect that Sam had driven the car at least twenty times as much as Lola did. Under the circumstances, when Lola was not even licensed at the time the statement was made and did not get her license for approximately six months thereafter, it was obviously true at the time of the application that Lola was not to be the principal operator of the car.

The second statement alleged to be false was in the application for insurance in which the question was asked who the sole owner of the car was and the answer was that Sam was the sole owner.

The certificate of title was in Sam's name. Amherst Motors had refused to sell to Lola Mae but had sold to Sam. Sam was bound along with Lola on the note to the bank. Sam was familiar with automobile titles and doubtless believed, as most people do and as is usually the fact, that a car belongs to the person in whose name the certificate of title stands. It may be that Sam was mistaken. But Mr. Singleton, the head of Ivey and Kirkpatrick, himself testified that all he was interested in was in whose name the certificate of title stood. There is no evidence as to what the understanding between Sam and Lola was. It is a fact, however, that even after Lola secured her license to drive the certificate of title was kept in Sam's name. It may have been understood that Sam was to repay Lola for the amounts that she had put into the car. The evidence is completely silent as to any understanding between Lola and Sam as to any obligation of one of them to repay the other for any payments on the car made by one or the other, the only exception being the statements made by Lola once or twice outside of Sam's presence, to the effect that she was the owner of the car.

The legal question of title to automobiles has been often before the courts and I am happy that I do not have to determine just who did in fact own the car in question at the time of the accident. It is sufficient that Sam could well have believed that he was the owner at the time he made application for the insurance, having just acquired the certificate of title and bound himself for future payments.

It is true that under § 38.1—336 of the Code it is provided that "[N]o statement in such application * * * shall bar a recovery upon a policy of insurance, or be construed as a warranty, anything in the policy to the contrary notwithstanding, unless it be clearly proved that such answer or statement was material to the risk when assumed and was untrue."

It may be argued that this statement of Sam's was material to the risk as there is evidence that if the insurance agency had known that Lola Mae had some claim to the car they would not have issued the policy or would have issued it only at a higher premium. And it may be argued that the statement was

untrue in that Sam was not the sole owner since Lola possibly had some sort of claim to it. However in the application there was no warranty of the truth of the statements but it was merely stated that the statements were true "to the best of my knowledge and belief." Certainly there is no indication that Sam did not believe that he was the sole owner of the car and in that event the statement was true to the best of his knowledge and belief.

In Sterling Insurance Co. v. Dansey, 195 Va. 933, 81 S.E.2d 446, the plaintiff had made a statement as to his health which he at the time believed to be true but which in fact was false as he had an illness that he did not know of. The insurance company argued that the statement "was material to the risk when assumed and was untrue." Literally this was so. But the application provided, as did the application in the case at bar, that the answers were "true to the best knowledge and belief of the applicant". The court held that though the answer was untrue it was "true to the best knowledge and belief of the applicant" and therefore the policy was not avoided by the fact that the answer was not literally true.

The court said at p. 941, 81 S.E.2d at p. 451:

"The plain language used by the parties in their agreement is not in violation of any law nor inconsistent with public policy. Forfeiture of an insurance policy is not favored because the insurance contract which in its nature is complex and difficult for the layman to understand, is generally drawn by experts who know and can anticipate the bearing and possible complications of every contingency. It is, therefore consistent with public policy to permit the insurer and insured to enter into an agreement, the validity of which is based on knowledge and belief in the statements made by the insured rather than on the literal truth thereof. Indeed, our research leads us to the conclusion that the insurer here could and did make a more favorable agreement with the insured than the statute prescribed. * *"

There is perhaps a distinction here from the case at bar in that in the Dansey case the application was attached to the policy and became a part thereof while that was not done in the case at bar. There is language in the policy to the effect that "By acceptance of this policy the insured * * * agrees * * * that this policy embodies all agreements existing between himself and the company or any of its agents relating to this insurance." From this it may be argued that the application in this case cannot be considered for any purpose in the absence of fraud. Harris v. State Farm Mutual Insurance Co., 6 Cir., 232 F.2d 532, and State Farm Mutual Insurance Co. v. Butler, 203 Va. 575, 125 S.E.2d 823. However if the applications cannot be considered for any purpose then there is nothing for the insurance company to hang its hat on in this case because it depends solely upon the representations as made in the application. And if the applications can be considered for any purpose they can certainly be considered for the purpose of showing that the statements made were made to the best of the applicant's knowledge and belief and were not to be considered as warranties.

In view of the foregoing it seems unnecessary to determine whether or not the subsequent acceptance by the agency of continued payments after it had knowledge of all of the facts would constitute a waiver of a right to cancel the policy if such right ever existed.

An order will be entered accordingly.