MARK SCHNUPP

v.

ANDRE L. SMITH

Record No. 940602

April 21, 1995

Present: All the Justices

*Wyatt B. Durrette, Jr. (Barrett E. Pope; Van C. Ernest; Durrette, Irvin, Lemons & Bradshaw*, on briefs), for appellant.
*David P. Baugh* for appellee.

CHIEF JUSTICE CARRICO delivered the opinion of the Court.

This is a slander case in which the plaintiff, Andre L. Smith (Smith), claims that the defendant, Mark Schnupp (Schnupp), defamed him by publishing to his employer a false statement accusing him of having committed a criminal offense. A jury returned a verdict in favor of Smith for $200,000 in compensatory damages and $100,000 in punitive damages. The trial court overruled Schnupp's motion to set the verdict aside and entered judgment for Smith. We awarded Schnupp an appeal and will affirm.

The evidence shows that, at the time in question, Smith was employed by ARA Corp. Refreshment Services and, as part of his duties, drove a van marked with ARA's name and logo. Schnupp was a police officer of the City of Richmond assigned to the drug enforcement strike force.

On the afternoon of August 21, 1992, Schnupp and a fellow officer, Mark Ambrozy, conducted a surveillance from the second floor of an abandoned building in the 900 block of North 26th Street, a high drug crime area in the eastern section of the city. The officers identified two "targets" on the street, one of whom wore a Miami Dolphins T-shirt. Schnupp testified that he observed three transactions in which one or the other of the targets received money from three separate persons in exchange for "some off-white soap-looking material" that Schnupp believed to be "crack cocaine." The officers took no action against any of the parties involved in these three transactions.

From this point on, the versions offered by Smith and Schnupp diverge sharply. According to Schnupp's version, an ARA van drove into the area about 3:30 p.m. and stopped "right in front" of Schnupp and Ambrozy. Schnupp testified that he "could look through the driver's window into the passenger's window."

Schnupp observed the "target" wearing the Miami Dolphins T-shirt walk to the driver's side of the van and engage the driver in conversation. The target then "went around to the passenger side of the vehicle . . . at which time the passenger and the target exchanged money for . . . some little white rocks [that Schnupp] believed to be crack cocaine." Schnupp then radioed the "take-down team," which was in position to stop the van. Schnupp saw the van drive southbound on 26th Street until it reached a stop sign, then turn right onto O Street, proceed another 50 yards to another stop sign, and cross 25th Street, at which time the take-down unit pulled in behind the van. Schnupp radioed the take-down team and identified the van as "the vehicle."

Ambrozy testified that he observed the van stop in the middle of the 900 block of North 26th Street and that he saw several persons approach the driver's side of the van, speak with the driver, and walk around to the passenger's side. At that point, Ambrozy said, he moved to another part of the building and observed another drug transaction taking place, so he did not see the transaction between the target and the passenger in the van.

According to Smith's version, after four o'clock on the afternoon in question, he was off duty and was driving along North 26th Street en route to his home with a friend, Robert B. Ragin, to work on an old van Smith had purchased from ARA. Both Smith and Ragin denied on the witness stand that they stopped in the 900 block of North 26th Street, and Ragin also denied that anyone had come up to the van and sold him drugs.

Smith and Ragin both testified that they did not stop until they had turned off North 26th Street and crossed 25th Street, at which point they were pulled over by the takedown team. Smith and Ragin were taken from the van at gunpoint and searched. Members of the takedown team looked inside the shoes worn by Smith and Ragin, turned their pants pockets inside out, and made them open their mouths and roll their tongues around. The van was also searched. When no drugs were found, Smith and Ragin were released.

After the surveillance had concluded on August 21 and Schnupp had returned to his office, he asked a member of the takedown team about what had occurred when the team searched the ARA van. When told "there was a lot of stuff inside the vehicle and a lot of places that contraband could have been hidden," Schnupp "had a bad feeling . . . that those two individuals in that vehicle did not belong in [it]."

With the permission of his supervisor, Schnupp called the office of ARA and talked with Cynthia Goss. Schnupp testified that he made the call to "check to see" whether the vehicle was stolen and whether "those people were authorized to operate [it]."

Goss testified that Schnupp told her the "whole story" about what had occurred concerning the ARA van. When asked by Smith's counsel whether Schnupp told her "he suspected that drug activity was afoot in [her] vehicle," she replied, "[r]ight." She said she had Schnupp repeat the "whole story" so she could "write everything down," and, contemporaneously, she made a note of what Schnupp said.

Goss reported the incident to her superiors and was told that Smith's employment with ARA should be terminated the following Monday, August 24. On Monday, Goss told Donald Eric Bowers, Smith's immediate supervisor, that a police officer had informed her on Friday that Smith "was over someplace where he wasn't supposed to be and that [Bowers] had to fire [Smith]." Goss also told Bowers the police officer had said that Smith "was

over at Church Hill buying or selling or [doing] something with drugs."

Smith reported for work as usual on Monday morning. After he had been working about two hours, Bowers took him into an office, told him his employment was terminated, and asked him to sign a handwritten paper stating that at "(3:30 Friday afternoon) (8/21/92) Andre was in location that was not part of [ARA] territory, during business hours and had a passenger with him that was not an ARA employee . . . against company's guidelines for use of ARA vehicles." Smith told Bowers he did not have anyone in the van with him on Friday, but admitted later that he had lied in an attempt to save his job.[1]

Smith refused to sign the paper, telling Bowers that the reason given in the paper for his termination was "B.S." Bowers testified that he also considered the reason "B.S." He stated that while "the drug allegation stuff [was] not in [the paper Smith was asked to sign]," he, Bowers, believed "drugs was [part of the reason for Smith's termination]."

With respect to guidelines, Bowers testified that there is a printed form "now" which "describes what drivers are supposed to do with vehicles that are being used for personal use" but that the question of guidelines had never "come up and it ha[d] not been discussed until after this incident." Bowers testified further that ARA employees, including Smith, had been allowed to use company vehicles for personal use. He stated that "[o]n that day," meaning August 21, 1992, Smith was permitted to take home the vehicle he was driving when stopped by the takedown team.

After Bowers informed Smith his employment was terminated, Bowers and a fellow employee escorted Smith out of the building in accordance with Goss's earlier instructions. The next day, Tuesday, Bowers telephoned Smith and told him another company official would investigate the matter on Wednesday. The official investigated, but when Smith called back on Thursday, Goss told him she had been "informed [he was] terminated . . . dismissed."

## I. *Defamation Per Se.*

The note Goss made of Schnupp's statement to her on the afternoon of August 21, 1992, was copied into Instruction Nos. 7 and

---

[1] Smith also told a police officer that he had no one in the van with him on Friday, August 21, 1992, but later admitted he did have a passenger.

17 and submitted to the jury as the sole basis for a finding of liability against Schnupp. In Instruction No. 7, the trial court told the jury that one of the issues was whether Schnupp made the statement, and, in No. 17, the court told the jury it should return a verdict for Smith if he proved "by clear and convincing evidence that [Schnupp] made the following statement or [implied] the subject of the following statement:"

> [An ARA] van license LKA 792 with . . . Andre L. Smith [driving] was seen at 3:25 p.m. at a high profile drug area on 900 North 26th Street. He was observed pulling up to that location and a passenger got out of passenger side went up to this location gave people something and received something in return, then this person known as Robert B. Regan [sic], Jr., got back in the van and they drove by the officer.

Schnupp argues that Smith sought damages on the theory that Schnupp's statement to Goss was defamatory per se because it imputed to Smith the commission of the criminal offense of aiding and abetting in the possession of narcotics. Citing *Great Coastal Express, Inc. v. Ellington*, 230 Va. 142, 146, 334 S.E.2d 846, 849 (1985), Schnupp says that, under the common law, defamatory words which are actionable per se include those that "impute to a person the commission of some criminal offense involving moral turpitude, *for which the party, if the charge is true, may be indicted and punished*."

Schnupp asserts that his statement to Goss "falls woefully short of imputing the elements of a criminal offense for which Smith may have been convicted." The statement merely describes the actions of the passenger, Schnupp maintains, and does not even suggest that Smith himself purchased drugs, knew the passenger was purchasing drugs, stopped the van to enable the passenger to purchase drugs, or in any way encouraged the passenger to purchase drugs. In short, Schnupp asserts, all that the statement imputes to Smith is his presence in the vehicle, and, under the law, "occupancy of a vehicle and mere presence at the scene of a crime, standing alone, do not provide the basis on which a party 'may be indicted and punished.' *Great Coastal*, 230 Va. at 146, 334 S.E.2d at 849."

Nor, Schnupp contends, may the meaning of his statement to Goss be expanded by innuendo to impute the commission of a

crime to Smith. Quoting *Moss v. Harwood*, 102 Va. 386, 46 S.E. 385 (1904), Schnupp states that " '*if the words do not impute such infamous crime by their natural sense and meaning*, then, as a general rule, the plaintiff is not entitled to recover; and, as *he cannot enlarge that meaning by an innuendo* so as to let in proof of extraneous facts, his action must fail.' " *Id*. at 390, 46 S.E. at 386. Hence, Schnupp concludes, the trial court erred in overruling his motions to strike Smith's evidence and to set aside the jury verdict.

■ We disagree. In the first place, Schnupp incorrectly interprets *Great Coastal* as requiring that defamatory words impute the commission of a criminal offense involving moral turpitude before the words can be considered as actionable per se. As the opinion in *Great Coastal* indicates, words that impute the commission of a crime which is "punishable by imprisonment in a state or federal institution" are also actionable per se. 230 Va. at 147, 334 S.E.2d at 850 (citing Restatement (Second) of Torts § 571 (1976)). Aiding and abetting in the possession of narcotics, which is the offense Smith claims Schnupp imputed to him, is a criminal offense punishable by confinement in a penal institution. Code §§ 18.2-18, -250(A).

■ Schnupp also misinterprets *Great Coastal* in another respect. In his argument based upon the reference in that case to an offense "for which the party, if the charge is true, may be indicted and punished," 230 Va. at 146, 334 S.E.2d at 849, Schnupp suggests that the defamatory words must be sufficient within themselves to establish all the elements of the offense imputed.

Such specificity, however, is not required. Indeed, on the related subject of libel, the defamatory words at issue in *James v. Powell*, 154 Va. 96, 152 S.E. 539 (1930), consisted of the publication in a newspaper of a false statement that the victim in a murder case "was shot with robbery as the motive." *Id*. at 102, 152 S.E. at 542. In affirming the trial court's action in overruling a demurrer based upon the assertion that the published words were "in no way actionable at common law," *id*. at 106, 152 S.E. at 543, we said it is sufficient "[t]o say that a man committed a felony which he did not commit," *id*. at 106-07, 152 S.E. at 543.

■ Furthermore, while *Moss v. Harwood, supra*, cited by Schnupp, may prohibit the use of innuendo to enlarge the natural meaning of words, the opinion also states as follows:

"In determining whether or not the language does impute a criminal offense the words must be construed in the plain and popular sense in which the rest of the world would naturally understand them. *It is not necessary that they should make the charge in express terms*. It is sufficient if they consist of a statement of matters which would naturally and presumably be understood by those who heard them as charging a crime."

*Id.* at 388, 46 S.E. at 386 (quoting *Payne v. Tancil*, 98 Va. 262, 264, 35 S.E. 725, 725 (1900)) (emphasis added); *see also Zayre, Inc. v. Gowdy*, 207 Va. 47, 50, 147 S.E.2d 710, 713 (1966) (security officer's demand to see contents of suitcase imputed commission of larceny to department store customer). And, as indicated by Instruction No. 17, granted in the present case, "a defamatory charge may be made by inference." *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 7, 82 S.E.2d 588, 592 (1954). ■ We think that Schnupp's statement to Goss, unaided by innuendo but assisted by the reasonable inferences to be drawn from the words used, while not charging a criminal offense in express terms, did impute to Smith the commission of the offense of aiding and abetting in the possession of narcotics. The trial court did not err, therefore, in refusing to grant Schnupp's motions to strike Smith's evidence and to set aside the jury verdict.

## II. *Admissibility of Investigative Report.*

According to Schnupp, Goss contacted him on Tuesday, August 25, 1992, and asked him to type and send to her a narrative of what had taken place concerning Smith the preceding Friday. Schnupp mailed Goss a written "Investigative Report," dated August 25, 1992. The report stated as follows:

On 8-21-92 members of Richmond Bureau of Police were conducting a surveillance in the 900 block of North 26th Street. A subject was identified as the target of the surveillance (this subject was dealing crack cocaine). At approx. 1531 hours (3.31pm) a ARA Services van entered the surveillance area and stopped in the 900 block. The van had two occupants, (both black males) and was bearing license plates Lka-792. [T]he target of the surveillance approached the passenger of the van and exchanged cocaine for money. The

van then left the area. All the information was relayed to a take down unit which stopped the vehicle in the area of 25th and Venable Street. Upon searching the occupants and the vehicle for the cocaine it was determined that the cocaine was destroyed prior to the Officers making the stop.

All these events occurred North of the James River in an area that is now an active drug spot.

Over Schnupp's objection, the trial court admitted the Investigative Report into evidence. Schnupp contends this was error. He argues that the report was irrelevant and unduly prejudicial because it represented "an entirely different instance of alleged defamation" and contained information different from the August 21, 1992 incident alleged in Smith's amended motion for judgment and referred to in Instruction Nos. 7 and 17. Furthermore, Schnupp says, Smith's damages were limited by Instruction No. 15 to insult and injury to reputation, and the only evidence of such injury "is a reflection of the August 21 statement and subsequent termination on August 24." Therefore, Schnupp opines, the report "is irrelevant to establishing liability" and to assessing damages.

In *Irvine v. Barrett*, 119 Va. 587, 89 S.E. 904 (1916), an amended motion for judgment alleged a defamatory statement in words that, although referring to the same transaction, were "essentially different from those spoken in the first instance, and on another occasion, and to another person." *Id.* at 591, 89 S.E. at 905. This Court held that the allegations of the amended motion for judgment constituted a different cause of action that could not relate back to the original motion and, hence, was barred by the statute of limitations. *Id.* at 592, 89 S.E. at 905.

■ However, in the course of the opinion in *Irvine*, the Court said that if the second statement is "intended merely to amplify the language imputed to the defendant in the original declaration," it would not constitute a new cause of action. *Id.* at 591, 89 S.E. at 905. We think the evidence in the present case shows clearly that the Investigative Report was intended by both Schnupp and Goss as a written confirmation of the earlier statement as well as an amplification of the language contained in that statement.

■ Goss testified that she called Schnupp "to ask for something in writing . . . [a]bout what went on that day," meaning August 21, 1992. She agreed that there was "nothing radically different" about the written report, and she said that "[i]t's a little more detailed than [the] telephone conversation." In his testimony, Schnupp acknowledged that Goss had called him and asked him for a written report about what he had told her on the telephone, and he characterized the report as "just a synopsis of what happened." Hence, the Investigative Report did not constitute a new cause of action.

■ We think further that, while Instruction Nos. 7 and 17 confined the jury's consideration to the earlier statement as the sole basis for a finding of liability, the contents of the Investigative Report were relevant to the issue of damages. It is true, as Schnupp contends, that Instruction No. 15 limits Smith's damages to insult and injury to reputation. However, in Instruction No. 15, which is uncontested on appeal, the trial court told the jury that, in determining the amount of damages, it should consider "*all* of the circumstances surrounding the *statements*, the occasion on which *they* were made and the extent of *their* publication." (Emphasis added.) This language is broad enough to allow the jury to consider both the statement of August 21, 1992, and the Investigative Report of August 25.

■ Furthermore, it was appropriate for the trial court to allow the jury to consider both statements on the issue of damages. Although Smith had been told on Monday, August 24, that his employment was terminated, he testified that his supervisor, Eric Bowers, called him the next day and told him that Jim Foley, who was ARA's regional manager located in Radnor, Pennsylvania, "was on his way to Richmond" and, on Wednesday, would investigate Smith's dismissal.

Smith testified further that Foley came to Richmond and "investigated Wednesday" but said he would not make "a determination of dismissal if nothing [was] in writing." Smith stated that when he called back on Thursday, "they [had] received a letter," and Goss told him: " 'I have been informed you were terminated,' you know, 'you're dismissed.' "

In deciding that the Investigative Report was admissible into evidence, the trial court stated that it was "a matter for the jury to determine" whether Smith's termination was complete on August 24 or whether it became final only after Foley's visit to

Richmond and the receipt by ARA of the Investigative Report. We agree with the trial court. If the jury believed the termination was not final until the later point in time, it could have awarded Smith damages for the period beyond August 24, 1992.[2]

### III. *Qualified Privilege.*

Schnupp contends that in order for the jury to award both compensatory and punitive damages in this case, "Smith had to prove by *clear and convincing evidence* that Schnupp made the alleged statement on August 21, 1992, with so-called *New York Times* [3] malice, namely[,] knowledge of falsity or so recklessly as to amount to a wilful disregard of the truth." Schnupp contends further that he was entitled to a qualified privilege and that Smith had to prove abuse of the privilege by clear and convincing evidence of *New York Times* malice or common law malice. Common law malice, Schnupp says, "includes statements that are unnecessarily insulting, language that is stronger or more violent than necessary under the circumstances, and statements made for the purpose of gratifying some sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure."

Schnupp maintains that there is "absolutely no evidence of common-law malice exhibited . . . in this case" and, therefore, that "the standard of proof regarding whether Schnupp abused his qualified privilege is identical to that regarding whether Schnupp is liable for compensatory and punitive damages: *New York Times* malice." That standard, Schnupp emphasizes, is proof by clear and convincing evidence that Schnupp made the statement on August 21, 1992, with knowledge of its falsity or so recklessly as to amount to a wilful disregard of the truth.

Quoting from *Zurich Ins. Co. v. Oglesby*, 217 F. Supp. 180, 183 (W.D. Va. 1963) Schnupp argues that, ordinarily, "if two witnesses equally credible testify in contradiction of each other, the evidence, in the absence of other circumstances pointing in one direction or another, is in equipoise and the plaintiff has not

---

[2] The record also shows that Smith was paid for eighty hours of work "for [the] period of time" including the week of August 24, but there was a conflict in the evidence concerning whether he was entitled to be paid for that much time. Ann Canfield Ball, ARA's general manager, testified that the payment of the larger amount was "a mathematical error," that Smith should only have been paid for eight hours of work on Monday, the 24th. This, too, was a matter for jury determination.

[3] *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).

proved his case." Schnupp then makes two surprising statements. First, he says that "[t]he present action differs from [the] principle set forth in *Zurich* in that Smith and his witness are less credible than Schnupp and his witnesses, and the burden of proof, i.e.[,] clear and convincing evidence, is higher." Second, Schnupp says that "the more demanding burden of proof, when combined with the essentially unchallenged veracity of Schnupp, demonstrates a total disregard of the instructions by the jury."

It should not be necessary to say in response to these statements that neither side has an edge on the issue of credibility in this case, that Schnupp is a party to this proceeding with just as much interest in the outcome as Smith, or that Smith's burden of proof is higher, not because he and his witnesses are less credible, but because the nature of his claim imposes a higher burden. The trial court told the jurors that they were the judges of the credibility of the witnesses and that in determining credibility, they should consider, among other things, the interest of the witnesses in the outcome of the case.

In Instruction No. 16, the trial court also told the jury that Schnupp's statement was privileged, that the statement was not protected if the privilege were abused, and that a privilege is abused when a plaintiff proves by clear and convincing evidence the existence of either *New York Times* malice or common law malice. This instruction was clear and to the point, it focused the jury's attention on the necessity to find malice by clear and convincing evidence as a predicate to finding an abuse of privilege and, contrary to Schnupp's assertion, there is nothing in the record to demonstrate "a total disregard of the instructions" by the jury.

That the jury found the existence of *New York Times* malice by clear and convincing evidence is demonstrated by the fact that it awarded punitive damages pursuant to Instruction No. 14, which required the finding of that type of malice by that standard of proof as a predicate to an award of such damages. Hence, the finding of an abuse of privilege is supported by the quality of evidence the higher standard of proof requires. *See Great Coastal*, 230 Va. at 155, 334 S.E.2d at 854.

## IV. *Compensatory Damages.*

Schnupp contends that the jury's award of $200,000 for compensatory damages is excessive. The jury could only base an

award of damages on insult and injury to reputation, Schnupp says, and "could not consider evidence of pecuniary loss, out-of-pocket expenses and injury to business, yet still made an enormous dollar award [bearing] no reasonable relationship to the extent of Smith's alleged injuries." Schnupp maintains that it was the duty of the trial court in the first instance, and is now the duty of this Court, to set the award aside.

Schnupp likens this case to *The Gazette, Inc. v. Harris*, 229 Va. 1, 325 S.E.2d 713, *cert. denied*, 472 U.S. 1032 (1985), where we set aside an award of compensatory damages for $100,000 in a libel case based upon a newspaper advertisement entitled "Racism" and stating that the plaintiff, a University of Virginia professor, did not " 'want any black people within his sight.' " *Id.* at 45, 325 S.E.2d at 743. We said that the amount of the award bore no relationship to the loss actually sustained by the plaintiff. *Id.* at 48, 325 S.E.2d at 745. We pointed out that the plaintiff experienced no physical manifestation of any emotional distress, that he had sought no medical attention for any condition resulting from the libel, and that there was no evidence that the plaintiff's standing with his peers was diminished as a result of the libel. *Id.*

Similarly, Schnupp says, Smith in this case had no physical manifestation or medical problems associated with the loss of his job. Furthermore, Schnupp asserts, the defamation regarding Smith was published to far fewer people than the libel against the professor in *The Gazette*. Therefore, Schnupp concludes, the verdict in this case could not have been the product of a fair and impartial decision.

But no two cases are exactly alike. Here, Smith detailed for the jury how he felt about being falsely accused of involvement in a drug transaction, saying "[t]hat's the [worst problem] I got." He related how he was bothered by the fact that "people [he] used to work with [thought he was] guilty of drug activities." He specifically mentioned that Cynthia Goss told Eric Bowers he, Smith, was guilty, that he "did it and [he was] fired." He also told about the difficulty he had in finding work and how, after a three-month search, he had to settle for two jobs, working long hours, yet making less money than he made before. Further, Smith said he was unable due to his work schedule to see his children because they left for school before he arose in the morning and were asleep when he returned from work at night. He bewailed the fact that he could no longer help his children with their homework, and

he lamented the financial situation resulting from his reduced income, which included the cancellation of plans to move the family to larger living quarters.

Smith's wife and one of his daughters corroborated the difficulty the family experienced as a result of the allegation that Smith was involved in a drug transaction and the fact that he lost his job. Mrs. Smith emphasized the anger Smith felt because no one would listen to his side of the story. Smith's daughter, Patrice, told about the upset her father experienced while he was out of work and about how his new work schedule prohibited him from helping her with her homework in the evening.

The trial court instructed the jury that, in determining damages, the verdict should be for an amount that would fully and fairly compensate Smith for (1) "any insult to him including any pain, embarrassment, humiliation and mental suffering," and (2) "any injury to his reputation." The court also told the jury that while there is no fixed standard for measuring compensatory damages, the amount awarded must bear a reasonable relation to the damages sustained.

"It is difficult, if not impossible, to prove with mathematical precision the quantum of damages for injury to reputation, humiliation, and embarassment which may flow from a defamation." *Great Coastal*, 230 Va. at 148, 334 S.E.2d at 850. Furthermore, this Court is not justified in setting aside a verdict if it "merely appears to be large and more than the trial judge would have awarded had he been a member of the jury." *Edmiston v. Kupsenel*, 205 Va. 198, 202, 135 S.E.2d 777, 780 (1964). But when it appears that the amount awarded is so great as to shock the conscience of the court or so out of proportion to the injuries suffered as to suggest that it is not the product of a fair and impartial decision, the court is obligated "to step in and correct the injustice." *Id.*

Here, in discussing the compensatory award in a letter opinion, the trial judge stated specifically that he could not find the damages shocking, or out of proportion, or lacking in a predicate for them. We agree with the trial judge. Even if "the amount of the verdict is larger than some members of this Court would have awarded had we been sitting as jurors in this case, we cannot say that it was excessive as a matter of law." *Modaber v. Kelley*, 232 Va. 60, 69, 348 S.E.2d 233, 238 (1986).

## V.  *Punitive Damages.*

▮▮ Although Schnupp has assigned error to the trial court's action in "overruling Schnupp's motion to set aside the $100,000 in punitive damages as being excessive" and has argued the assignment in the brief he filed in this Court, he failed to preserve the point in the trial court. Neither in his motion to set aside the verdict nor in his supporting memorandum was the subject of the excessiveness of the punitive award even mentioned. Hence, Schnupp waived the point and cannot assert it for the first time on appeal. Rule 5:25.

## VI.  *Malice.*

▮▮ Because punitive damages were awarded, we must make an independent examination of the entire record to determine whether the evidence is sufficient to support a finding of *New York Times* malice by clear and convincing evidence. *Bose Corp. v. Consumers Union*, 466 U.S. 485, 514 (1984); *Great Coastal*, 230 Va. at 156, 334 S.E.2d at 855. This examination is necessary to make certain that the award of punitive damages "does not constitute a forbidden intrusion on the field of free expression." *New York Times*, 376 U.S. at 285.

▮▮ In making the independent examination, we give deference to "the determinations made on credibility of witnesses by the trier of fact [and to] the presumption of correctness that attaches to factual findings." *The Gazette*, 229 Va. at 19, 325 S.E.2d at 727-28. Having made the independent examination with such deference in mind, we hold that the record fully supports a finding of *New York Times* malice by clear and convincing evidence.

For the reasons assigned, we will affirm the judgment of the trial court.

*Affirmed.*