## CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

Jesse Roger Sheckler

    v.

Virginia Broadcasting
Corp. et al.

November 7, 2003

Case No. (Law) 02-60

BY JUDGE EDWARD L. HOGSHIRE

This is to address defendant Virginia Broadcasting Corporation's ("Defendant") Motion To Set Aside the Verdict and for a New Trial (Either in Toto or on the Issue of Damages Only), or in the Alternative, for Remittitur, challenging the award of damages in the above-named defamation action.

Before addressing the merits of the Motion before the Court, it should be noted that certain core facts in the case were not in dispute. For example, the Defendant's broadcasts in question, having occurred on April 6th and 7th and again on October 29th and 30th of 2001, contained inaccurate information regarding Plaintiff's arrest for conspiracy to distribute cocaine, namely that law enforcement officers found fifty grams of crack cocaine and five hundred grams of powder cocaine at Plaintiff's residence and business. One of the broadcasts also displayed a photo of an unidentified man being arrested near the doorway of a home or business. These stories appeared over the air and on cable television and were also uploaded to the station's website. After a criminal jury trial in the U.S. District Court in Charlottesville, the Plaintiff was acquitted of the criminal charge on October 31, 2001.

Over the three days of this civil trial, the jury heard from the Plaintiff, members of his family, his treating psychiatrist, and many friends. They also heard testimony from an expert witness who, over the objection of the

Defendant, was permitted to testify regarding applicable journalistic standards of care. The Defendant's reporters involved in the defamatory broadcasts testified both in person and through a video deposition, as did the Defendant's news director and manager. There was testimony from Plaintiff's former attorneys regarding efforts to secure a correction or retraction. Each side called an expert witness to testify regarding Plaintiff's mental health and emotional condition. The Plaintiff's expert, Dr. Shemo, and the Defendant's expert, Dr. Cohen, agreed that the Plaintiff was suffering from depression, but did not agree on the cause and on whether he was also suffering from post-traumatic stress disorder.

The jury also heard testimony from the DEA agent who was in charge of the criminal investigation that led to Plaintiff's arrest and from the Assistant U.S. Attorney who prosecuted the case. It was this Assistant U.S. Attorney who was named by one of Defendant's reporters as the source of the incorrect information in the broadcasts. His secretary also testified about having conversations with various reporters. There was no dispute that the Plaintiff was in fact arrested at a local filling station, not at his home or business, and charged with conspiracy to distribute cocaine. It was also not disputed that the U.S. Attorney's office filed a lien against the Plaintiff's real estate. The jury here also heard much about the criminal prosecution, including the evidence that the Plaintiff had loaned a substantial sum of money without collateral or documentation to a man who later was shown to have been distributing large quantities of cocaine. The Defendant presented testimony of reporters from two local newspapers that also covered the Plaintiff's criminal prosecution and whose stories were also less than factually accurate and potentially defamatory.

At the conclusion of the trial, the jury here returned with a finding of liability against the Defendant television station and awarded Plaintiff $10,000,000.00, all as compensatory damages, the full amount sought. It is from this verdict that the Defendant seeks relief.

As grounds for the Motion, Defendant has listed a number of allegedly erroneous rulings by this Court, including the failure to give proffered defense instructions N and O, the admission of expert testimony on journalistic standards of care, and the admission of testimony by a former counsel for Jesse Sheckler, the plaintiff, concerning a requested retraction. These issues have been argued extensively by the parties and carefully considered by the Court on previous occasions, both before and during trial. Suffice it to say that the Defendant has not cited a sufficient basis for the Court to reconsider its previous rulings on these issues.

The remaining grounds for the Motion, however, raise new issues and present serious concerns regarding the legal viability of the jury's award. These include whether the award is excessive, whether the award has the First Amendment implications, and whether the Plaintiff's evidence was sufficient to prove that the damages alleged were proximately caused by the defamatory parts of the subject broadcasts. After carefully reviewing the trial transcript, the Court has concluded that liability was clearly established by the evidence in the case and that the jury had ample evidence upon which to find the Plaintiff suffered severe emotional distress, as well as the elements of damages set forth in the damages instruction given to the jury without objection. This instruction allowed the jury to assess the "probable and natural effect upon Jesse Sheckler's personal feelings and upon his standing in the community and in his business ... any insult to him including any pain, embarrassment, humiliation, and mental suffering; and any injury to his reputation." (Instruction No. 13, from the Virginia Model Jury Instruction No. 37.100.)

But that does not end the inquiry. Plaintiff's counsel concedes that there was no evidence of lost income, but cites the "impact of the defamation on his business." (Pl.'s Opp'n Def.'s Post-Trial Mot. at 10 (hereinafter "Pl. Mem.").) There was credible evidence of loss of customers even though the Plaintiff's income levels did not decrease, but actually increased over the short term following the challenged broadcasts. The issue is whether these losses were caused by the defamatory publication or simply from the total impact of the negative publicity and attendant loss of reputation from Plaintiff's Federal prosecution and trial. In addition, the Plaintiff has also acknowledged that there were no medical expenses proven or offered into evidence; consequently, these expenses could not have been a part of the jury's consideration.

Thus refined, the primary issue remaining is whether the verdict, based solely on intangible factors as set forth in the above-quoted instruction, is so excessive as to require the Court to set it aside and order a new trial, or, in the alternative, a new trial limited solely to damages or, finally, to require the Plaintiff to remit a portion of the award or submit to a new trial limited to damages alone.

Under § 8.01-383 and § 8.01-383.1 of the Code of Virginia, where damages awarded are too small or too excessive, courts have the authority to order a new trial, on all issues or solely on the issue of damages, or remittitur.

§ 8.01-383. *Power to grant new trial; how often.* – In any civil case or proceeding, the court before which a trial by jury is had, may grant a new trial, unless it be otherwise specially provided. A new

trial may be granted as well where the damages awarded are too small or where they are excessive. Not more than two new trials shall be granted to the same party in the same cause on the ground that the verdict is contrary to the evidence, either by the trial court or the appellate court, or both.

§ 8.01-383.1. *Appeal when verdict reduced and accepted under protest; new trial for inadequate damages.* − A. In any action at law in which the trial court shall require a plaintiff to remit a part of his recovery, as ascertained by the verdict of a jury, or else submit to a new trial, such plaintiff may remit and accept judgment of the court thereon for the reduced sum under protest, but, notwithstanding such remittitur and acceptance, if under protest, the judgment of the court in requiring him to remit may be reviewed by the Supreme Court upon an appeal awarded the plaintiff as in other actions at law; and in any such case in which an appeal is awarded the defendant, the judgment of the court in requiring such remittitur may be the subject of review by the Supreme Court, regardless of the amount.

While, as a general rule, a trial court should not disturb a jury award that has been fairly rendered and based upon competent evidence, "a jury verdict is not beyond the control of the courts. Courts have a duty to correct a verdict that plainly appears to be unfair or would result in a miscarriage of justice." *Poulston v. Rock*, 251 Va. 254, 258, 467 S.E.2d 479, 481 (1996) (citing *Edmiston v. Kupsenel*, 205 Va. 198, 202, 135 S.E.2d 777, 780 (1964); *Smithey v. Sinclair Oil Refining Co.*, 203 Va. 142, 146, 122 S.E.2d 872, 875 (1961)).

If the verdict merely appears to be large and more than what the trial judge would have awarded had he been a member of the jury, it should not be disturbed, because to do so would be to "do what he may not legally do, that is, substitute his judgment for that of the jury." *Smithey*, 203 Va. at 146, 122 S.E.2d at 875. But, the *Smithey* court explains that:

if it appears that the verdict is so excessive as to shock the conscience of the court and to create the impression that the jury has been influenced by passion, corruption, or prejudice, or has misconceived or misunderstood the facts or the law, or if the award is so out of proportion to the injuries suffered to suggest that it is not the product of a fair and impartial decision, then it becomes the plain duty of the judge, acting within his legal authority, to correct the injustice.

*Id.*, 122 S.E.2d at 875-76.

The Court cannot identify with certainty the precise rationale that underlies the award. There is no evidence that the jury was "influenced by passion, corruption, or prejudice." Indeed, this jury appeared to have conducted itself with attentiveness, diligence, and integrity; but the size of the verdict is so disproportionate to the plaintiff's defamation-related injuries as to "shock the conscience of the Court." *See Smithey*, 203 Va. at 148, 122 S.E.2d at 877 (the size of a disproportionate verdict "is sufficient, standing alone, to shock the conscience of the court and to cast upon it the stamp of unfairness"; *National Cab v. Thompson*, 206 Va. 731, 739 (1968) ("Although the record contains no evidence that the jury was actuated by passion, corruption, or prejudice, the verdict is so excessive as to shock the conscience of the court.").

In addition, the Court is also mindful of the First Amendment implications of this award. The excessiveness of this award may, whether intended by the jury or not, be punitive in effect. In *Gertz v. Welch*, the Supreme Court of the United States held that the states may not permit recovery of presumed or punitive damages when the liability is not based on a showing of knowledge of falsity or reckless disregard for the truth. 418 U.S. 323, 349 (1974). There, the Supreme Court recognized the potential of "any system of liability for defamatory falsehood to inhibit the vigorous exercise of First Amendment freedoms," and required that "state remedies for defamatory falsehood reach no farther than is necessary to protect the legitimate interest involved." *Id.* *Gertz* limits defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation only for actual injury. *Id.*

In cases where the verdict is appealed for excessiveness, the Virginia Supreme Court has stated that "it is proper to make comparisons with the verdicts which other juries have found in other cases for similar injuries." *Chesapeake & Ohio Ry. v. Arrington*, 126 Va. 194, 218, 101 S.E. 415, 423 (1919). Each case must be determined by its own facts, but "it is nevertheless true that the verdicts of other juries which have been approved by the courts … represent the common or average judgment of mankind as to the proper recovery in such cases." *Id.*

A review of recent defamation cases reported by the Virginia Supreme Court reveals that the jury award in this case far surpasses that of any other defamation award ever sustained on appeal in Virginia. In *WJLA-TV v. Levin*, a doctor was awarded $2,000,000.00 for defamation contained in a news broadcasts aired by a television station. 264 Va. 140, 564 S.E.2d 383 (2002). The doctor had requested $30 million in compensatory damages for a story that accused him of sexually assaulting female patients and performing inappropriate medical procedures. *Id.* at 147, 564 S.E.2d at 387. The plaintiff was also repeatedly referred to as the "Dirty Doc" and "the X-Rated Doctor"

in promotional announcements preceding the broadcasts, which contained his picture. *Id*. WJLA-TV argued that the $2 million award was ten times larger than any prior award in a defamation action sustained by the Virginia Supreme Court and bore no reasonable relation to the injuries suffered. *Id*. at 162, 564 S.E.2d at 396. The Virginia Supreme Court, in sustaining the award, noted that the doctor presented un-rebutted evidence of actual damages in excess of $900,000, and found that "given the grave nature of the unfounded allegations ... and the inevitable damage caused to his professional reputation, the jury's award was not excessive." *Id*. However, in this case, unlike the case at bar, the plaintiff carried the burden of proving actual malice, and therefore, the plaintiff was entitled to receive *presumed* as well as actual damages. *Id*. at 56, 564 S.E.2d at 392 (emphasis added).

Lower compensatory damage awards have been sustained in other cases. In *Richmond Newspapers, Inc. v. Lipscomb*, the Virginia Supreme Court sustained a remittitur of $900,000 of a $1,000,000.00 compensatory damage award for defamation arising out of the publication of a front-page article in the *Richmond Times-Dispatch* which reported on complaints about plaintiff's performance as a teacher. 234 Va. 277, 362 S.E.2d 32 (1987). In upholding the remittitur, the Court found that the defamed plaintiff was "substantially and adversely affected by the defamatory publication," quoting testimony from plaintiff's minister that plaintiff was "totally destroyed and distraught, was withdrawn and afraid ... she was not the self-confident and assured person she had been," and other similar testimony by plaintiff's supervisor at work. *Id*. at 300, 362 S.E.2d at 45. The Court also cited plaintiff's testimony that she felt "her whole career and life had been destroyed," and that she is very ill at ease in crowds and that she never knows what people are thinking. *Id*.

In *Fleming v. Moore*, the Virginia Supreme Court remanded a case to the trial court for a substantial remittitur or a new trial on the issue of damages. *Fleming v. Moore, sub nom. The Gazette, Inc. v. Harris*, 229 Va. 1, 49, 325 S.E.2d 713, 745 (1985). The jury awarded compensatory damages of $100,000 for publication of an advertisement accusing plaintiff of racism in the campus newspaper of the university where plaintiff was a professor. *Id*. at 43-48, 325 S.E.2d at 742-45. In agreeing with defendant that the amount of the award bore no relationship to the loss actually sustained by the plaintiff, the court stated:

[c]learly, Moore suffered damage to his reputation, embarrassment, humiliation, and mental suffering from this defamatory publication made negligently. Nevertheless, the verdict of $100,000 is so out of proportion to the damage sustained as to be excessive as a matter of

law. As defendant points out, Moore experienced no physical manifestation of any emotional distress. Moreover, he sought no medical attention for any condition resulting from the publication. In addition, there was no evidence that Moore's standing with his peers was diminished as the result of the libel. ... Actually, the evidence showed that Moore continues to be held in high esteem among his community of friends and colleagues.

*Id.* at 48, 325 S.E.2d at 745.

In a case similar to the one before the Court, the plaintiff in *Schnupp v. Smith* sued a police officer for publishing to his employer a false statement of plaintiff's involvement in a drug transaction. 249 Va. 353, 457 S.E.2d 42 (1995). The court noted that the plaintiff subsequently lost his job and was unable to find comparable work and had to settle for working longer hours in two jobs for less money than he made before. *Id.* at 366, 457 S.E.2d at 49. As a consequence, he no longer had time to see his children and help them with their homework and generally was in a reduced financial situation. *Id.* He was also bothered by the fact that people he worked with thought he was guilty of drug activities and was angry that no one would listen to his side of the story. *Id.* The plaintiff's wife and daughter corroborated the difficulty the family experienced as a result of the drug allegations and the fact that he lost his job. *Id.* at 367, 457 S.E.2d at 50. Although defendant argued, citing *Fleming*, that the plaintiff had no physical manifestation of emotional distress or medical problems associated with the loss of his job, the Supreme Court of Virginia upheld the compensatory damage award of $200,000. *Id.* at 366, 457 S.E.2d at 49. The *Schnupp* court agreed with the trial court in that it could not find the damages shocking, out of proportion, or lacking in a predicate for them. *Id.* at 367, 457 S.E.2d at 50.

While every case is different, the synopsis of cases shown above suggests that the Court would be acting well within its authority, duty, and discretion in ordering a new trial or remittitur in this case. Here, the jury award of $10,000,000.00, with no evidence of actual economic loss, coupled with the First Amendment implications of the award, must invite very close scrutiny.

A review of the evidence of emotional harm here must focus on the extent to which any of the damages alleged were shown to have been attributable to the Defendant's defamatory words as opposed to other extraneous causes. Plaintiff faced the ordeal of the public arrest and Federal prosecution of the cocaine conspiracy charge, and there was evidence of myriad pre-existing physical and emotional maladies. In support of Plaintiff's claims, his treating psychiatrist, Dr. John Shemo, testified that after Plaintiff was acquitted of his

charges, he continued to experience anxiety and depression which Plaintiff attributed to the inaccurate statement in the broadcasts. He provided the following observations regarding the connection between the defamatory statements and the Plaintiff's mental health:

> [W]hat he [Plaintiff] described to me even after being acquitted, he continued with a lot of both symptoms of anxiety and depression. He ascribed this to the fact that although he was acquitted in court, that his reputation has been severely damaged by the events, and especially by the broadcasts. And that being acquitted really did not undo this damage to him, that people had seen these broadcasts.
>
> The problems occurred on two levels. First of all, his business, he feels, significantly suffered. People who had been customers of his for years were not bringing their cars to him anymore. . . .
>
> But also on a personal level, he felt that both he and his family were ostracized within the community. And he felt very self-conscious about going out in public ... his sense was that reports that there were actually drugs found in his home was particularly damaging, because he feels that that belief in people's minds made many people feel that he, therefore, was acquitted on technicalities, to use his terms, rather than on the basis of the facts of the case. Because people continued to believe that there had been drugs in his home.

(Trial Tr. 396-97.) Dr. Shemo further testified that he believed that the Plaintiff's depression and post-traumatic stress disorder occurred in the context of a traumatic experience.

> Q. What was the traumatic experience?
>
> A. I believe the traumatic experience involved the whole situation of his arrest and trial, but I think the most significant part of that, as he has persistently maintained with me from the beginning, has been his sense of the damage done to him and to his life system by the inaccurate, what he viewed as the inaccurate reports of the news broadcasts, and their unwillingness to revise these when told by, I understand, various people that their data was inaccurate.

(Trial Tr. 418-19.)

Dr. Bruce Cohen, on the other hand, a forensic psychiatrist who testified for the Defense, stated that in his opinion the Plaintiff was not suffering from post-traumatic stress disorder and that his other mental conditions were long-

standing, predated the subject broadcasts, and could not be said to have. been caused by those broadcasts. (Trial Tr. 988, 989.) Thus joined, the opposing views of the experts were properly left to be considered by the jury, which presumably gave Dr. Shemo's testimony greater weight.

The Plaintiff testified at some length, as did his wife and daughters and many of his friends, as to the effects of the defamatory broadcasts. The testimony covered how the broadcasts impacted Plaintiff's personal feelings, his reputation and standing in the community, and his business. The testimony also covered Plaintiff's pain, embarrassment, and humiliation as a result of the broadcasts. Plaintiff testified that "[a] lot of people came and argued with me and told me that they knew it was true because they showed signs of someone breaking and entering my house on the TV. And they said it's got to be true if it's on TV." (Trial Tr. 546:14-18.) His wife and children described what they saw and how Plaintiff had changed as he became increasingly debilitated.

Keith Erikson, Plaintiff's friend of twenty years, testified that he saw the April 6, 2001, broadcast on Channel 29 that said authorities confiscated cocaine in Plaintiff's home and business. (Trial Tr. 638.) Erikson stated that he believed it, "because it was so factual, so specific. It wasn't even larded with any of the usual alleged stuff that you see in the newscasts these days. And it was too factual. It was too specific for me to disbelieve it." (Trial Tr. 638:13-17.) He further testified:

I had a long discussion with myself. And I finally said that with drugs being found at his place he's got to have — he's to have done something very, very bad. And I resolved to sever our friendship. And I resolved to have nothing more to do with him. And that's what I did.

(Trial Tr. 638:19-24.)

Doug May, who works at a salvage yard with his father, testified that he believed the reports of cocaine at Plaintiff's house to be true and that this. belief had an impact on his relationship with Plaintiff. (Trial Tr. 668-69.) He stated that his father's salvage yard business has not done a lot of business with Plaintiff's garage since the incident. *Id.*

Kenny Snow, a maintenance mechanic who has known Plaintiff for thirty years, testified that he also believed the defamatory statements. Explaining why he believed the contents of the broadcasts, he stated the following:

It was just, you know, you believe so much from watching the TV. And when all of this situation came up with Jesse, I didn't believe none [sic] of it. I just believed something was — you know, Jesse wasn't guilty of anything. But when I came home that afternoon and

my wife said look what's on TV and I seen [sic] that news report –
and at that point, as good as a friend I was with Jesse, I really believed
that he was guilty when I seen [sic] it when they confiscated drugs.

(Trial Tr. 671.)

Although hotly disputed by the defense, the factual predicate for a finding of damage to reputation, loss of community standing, humiliation, etc. was presented from the testimony. Added to the quantum of harm was the geographical breadth of the Channel 29 broadcast range (Trial Tr. 235, 236), the fact that the broadcasts were also carried on cable (Trial Tr. 236), and that the news broadcasts were uploaded on the Internet. The fact of instant world-wide circulation and the impact on one's "good name" was certainly a legitimate factor for the jury's consideration. One witness testified he had seen one of the broadcasts summarized on the Internet, although he said he saw it on Channel 4 instead of Channel 29. The jury could have concluded that he was mistaken about the channel number, although the station does appear as Channel 4 on cable. (Trial Tr. 951.)

Thus, the jury had sufficient evidence upon which to find the Defendant liable to the Plaintiff. The damages, however, had to be limited strictly to compensatory elements in Instruction No. 13, set forth above. But the Defendant could be held responsible only for those injuries inflicted by the defamatory portions of the Defendant's broadcasts, not the losses or injuries sustained from the attendant arrest, prosecution, and forfeiture proceedings, or from the newspaper accounts and the accurate portions of the television broadcasts and Internet publications reporting those events. Likewise, the Defendant could not be held liable for creating any of the emotional, mental health, or physical symptoms deemed to have predated the defamatory broadcasts.

Notwithstanding these limitations and conditions, the jury awarded the Plaintiff $10,000,000.00, an amount more than sufficient to compensate him for all of his injuries from any source whatsoever. The most plausible explanation for the size of the award is that the jury misperceived the law and the instructions and, instead, set out to punish the Defendant in addition to compensating the Plaintiff. This explanation is supported by a review of Plaintiff's counsel's remarks in summation. Instead of asking for compensation for proven losses, Plaintiff's counsel, without objection, asked the jury to require the Defendant television station to pay an "enormous sum of money to clear Mr. Sheckler's good name." In his opening remarks, counsel had alluded to defamation as "spreading poison in a pool" and returned to this colorful metaphor in his summation. (Trial Tr. 135, 1148, 1149.) After a brief reference to the SARS epidemic having "jumped across countries and around

the world in a very short time," counsel said, "Poison, ladies and gentlemen, dropped in the corner of a pool eventually, eventually poisons all of the life in the pool." (Trial Tr. 1148.) Then minutes later he returns again to this same metaphor:

> If the retraction had been dropped in the pool the same day, or the next day, the retraction would have spread just the same way that the poison had spread. But for twenty-five months now that poison has laid in the pool and it is very, very hard to dislodge a two-year belief.

(Trial Tr. 1150.)

Counsel, continuing his summation, briefly changed the metaphor to one of removing a blood stain from a shirt, noting that "if the blood dries and sets, you will never get it out, the cleaner cannot get it out." *Id.* He then told the jury that "the only way to restore Jesse's good name in this community is for a jury of neutral citizens, just like yourself, to say a reputation like Jesse's is of enormous value. A good name is priceless." *Id.* He continued by noting that "the law requires an amount of money to compensate for that harm to be as enormous as the harm was to Jesse's good name," and that "a verdict less than enormous will let 29 escape its responsibility to make up for all the harm that it did." (Trial Tr. 1151.) The jury was told, in addition, that if the verdict "is less than enormous" the Defendant's news director and manager will "high five one another, and who knows what will happen next." *Id.*

Finally, after evoking the cataclysmic image of the Defendant's being allowed to run amuck if not hit with a huge verdict, Plaintiff's counsel admonished the jury as follows:

> If you return a small verdict, ladies and gentlemen, like a million dollars, a small verdict, people will conclude that a good man's reputation just is not worth very much. They may conclude that the story could have been true.
>
> But an enormous verdict will clear the poison from the pool. A $10 million dollar verdict will travel just as far, and just as wide and just as deep as the lies, the poisonous lies spread by 29.
>
> If your verdict is enormous, then Jesse will be able to hold his head up and walk the street again, and everybody will know 29 was wrong.
>
> The restoring of his good name is in your hands, and the only way to restore his good name is to award him enough money to make it absolutely clear that what 29 did to him was enormous harm. Your verdict has to be as big as the harm, it has to balance the wrong that

was done to him. 29 did $10 million dollars worth of damage to him. You will balance the harm with a $10 million verdict. That is why the case is so important.

(Trial Tr. 1152.) Then, in his last call for relief to the jury in rebuttal, Plaintiff's counsel states:

Only one way to solve this, ladies and gentlemen. He is a good man. He is a good man. The poison that they put in the pool in which he has lived for 52 years has spread long, far, wide, and deep. The only way you will get the poison out of the pool is with a verdict so big that everybody will hear about it, everybody.

(Trial Tr. 1197.) Despite Defense arguments that no liability has been established and no damages were caused by the broadcasts, the jury was persuaded that their duty was to "get the poison out the pool" and award a verdict "so big that everybody will hear about it."

In essence, the jury clearly misperceived its role and awarded a sum far in excess of an amount reasonably calculated to compensate for any proven losses. It is five times larger than the largest verdict approved by the Virginia Supreme Court in *WJLA-TV v. Levin*, where presumed damages were allowed. 264 Va. 140, 564 S.E.2d 383 (2002). Absent a showing of economic losses and given no part of the award could be designated as presumed or punitive damages, the First Amendment, as discussed above, is clearly implicated; what appears is an award of punitive damages under the rubric of compensatory damages.

Upon these findings, the Court must set aside this verdict. In doing so, the Court, according to Virginia Code §§ 8.01-383 and 8.01-383.1, must either order a new trial on all issues, a new trial limited to damages, or put the Plaintiff on terms to remit part of the award. Since the Court has found that the evidence established liability as well as substantial compensatory damages, it would be unfair and unnecessary to direct a new trial on the issue of liability. But the largest award that could reasonably be sustained in this case consistent with the First Amendment, when seen in light of the prior defamation awards discussed above, is $1,000,000.00. The Court, therefore, will order that the Plaintiff remit $9,000,000.00 of the award to the Defendant or, in the alternative, will order that a new trial be scheduled limited to damages only. The Court will allow Plaintiff until November 21, 2003, to advise the Court as to which course of action he chooses.