NIEMEYER, Circuit Judge:
After WCHS-TV8 in Charleston, West Virginia, broadcast a news report that a four-year-old child was sexually abused at Kim’s Kids Daycare in Barboursville, West Virginia, Kim Tomblin, the owner of the daycare, commenced this action for defamation and related torts. On WCHS-TV8’s motion, the district court entered summary judgment in favor of the television station (actually Sinclair Media III, Inc., the station’s owner), concluding that the station accurately reported the abuse allegations made by the mother of the child.
After review of the record, including a copy of the broadcast in question, we conclude that there are genuine issues of material fact as to Tomblin’s claims. By reporting that the daycare was alleged to have abused a child, the television station may have published a false statement inasmuch as it knew and left out the fact that the incident involved one four-year-old boy touching the rectum and genitalia of another four-year-old boy. Accordingly, we vacate the summary judgment and remand to the district court for further proceedings. We also affirm in part and reverse in part two evidentiary rulings made by the district court.
*207 I
On June 10, 2008, the mother of a four-year-old boy submitted a complaint to the West Virginia Department of Health and Human Resources (“DHHR”) that while her son was attending Kim’s Kids Daycare, another four-year-old boy stuck his finger in her son’s rectum and grabbed his genitals. Kim’s Kids Daycare was a state-licensed daycare operated by Kim Tom-blin, her husband, and a staff of approximately six employees. Some two to three dozen children between the ages of two and five regularly attended the daycare.
The DHHR investigated the complaint and was unable to corroborate the charge. It issued a report on June 26, 2008, indicating that “Child neglect ha[d] not occurred.” The report did indicate, however, that twice previously the daycare was cited for inadequate supervision of the children (in 2006 and in 2007) and that “the possibility that an incident [of child neglect] could occur is likely.” The report also indicated that staff members were observed smoking, for which the daycare had, in 2003, also been previously cited. The DHHR provided a copy of its report to the mother.
On July 1, 2008, when Kim’s Kids Daycare’s license came up for renewal, the DHHR informed Tomblin that the license would not be renewed, based on past violations. Tomblin appealed the decision, and, pending appeal, Tomblin was authorized to continue operating the daycare.
About three weeks after receiving a copy of the report, the mother of the four-year-old boy who had been inappropriately touched called WCHS-TV8, a local television station in Charleston, to report that her child “was sexually abused while at Kim’s Kids Daycare.” WCHS-TV8 assigned reporter Elizabeth Noreika to investigate the allegations. After speaking with John Law, a DHHR official who told Noreika that an investigation was ongoing and an appeal was pending with respect to the non-renewal of Tomblin’s license, No-reika interviewed the mother, who told Noreika that “while at the daycare her child had been sexually abused.” The mother provided Noreika with a copy of the DHHR report, which Noreika read in its entirety. The report provided the details of the charge: “A boy at Kim’s Kids Day Care touched [a four-year-old boy] inappropriately by sticking his finger in his rectum and grabbing his genitals. [The four-year-old boy] is now displaying these behaviors.” The report then summarized the investigation conducted by the DHHR and concluded: “Finding(s): Child neglect has not occurred.”
Noreika then had John Law, the DHHR official, meet separately with a WCHS-TV8 cameraman to give a short statement about the investigation and the appeal.
Finally, Noreika visited Kim’s Kids Daycare and spoke with a person there (later determined to be Tomblin), who declined to comment aside from indicating that the allegations of abuse were false.
That evening, WCHS-TV8 aired a two-minute story, based on Noreika’s reporting. The story began as follows:
MOTHER: How would you feel if it was your child?
ANCHOR 1: This mother says her child was sexually abused, our top story tonight, the state is investigating a daycare ....
ANCHOR 2: Some serious allegations of abuse and neglect have the state keeping a closer eye on a Barboursville daycare. Eyewitness News reporter Elizabeth Noreika joins us live in the studio on why one parent is speaking out.
NOREIKA: Rick, a mother says she has taken her children out of Kim’s Kids *208 child care in Barboursville because she says her young son was sexually abused. The woman asked that we conceal her identity.
MOTHER: I just can’t even describe how I felt, I was just very angry, that my kids were subjected to this.
NOREIKA: A woman says this daycare in Barboursville abused her trust and her child [screen displays shots of Kim’s Kids daycare, including its sign],
MOTHER: He’ll probably be scarred for life from it.
NOREIKA: This mom says she started to worry when her 3-year old began acting different.
MOTHER: My son was displaying abnormal behavior at home, the minute I saw the behavior, they didn’t go back.
NOREIKA: She alleges her son was sexually abused while at Kim’s Kids childcare. She also says the daycare’s workers smoke around children and engage in other inappropriate behavior [screen displays close-up shots of language from the DHHR report].
The broadcast continued with footage of Noreika’s visit to Kim’s Kids Daycare, which showed Noreika asking an unidentified Kim’s Kids employee for comment. The employee responded “sure” and invited Noreika in to discuss the allegations. Narrating, Noreika stated that “workers wanted the camera turned off, saying any and all allegations aren’t true.” The segment concluded with on-camera statements from Law, the DHHR spokesman, who indicated that the DHHR initially moved to close Kim’s Kids but later “had a change of heart” after Tomblin appealed.
An identical story was broadcast later on WVAH Fox News 11, which is an affiliated station.
As a result of the broadcast, Tomblin claimed that she became depressed. She withdrew from her church congregation for several months, lost considerable weight, contemplated suicide, and experienced insomnia. Both Tomblin and her husband also claimed that eight children pulled out of Kim’s Kids Daycare following the broadcast.
Tomblin commenced this action in October 2008 against WCHSTV8 in the Circuit Court of Cabell County, West Virginia, alleging that WCHS-TV8 (1) defamed her by falsely stating or insinuating that she or one of her employees had sexually abused a child; (2) cast her in a false light by showing her image on the screen during the broadcast, thus implying that she had sexually abused a child; and (3) intentionally inflicted emotional distress by falsely accusing her of such acts. WCHSTV8 removed the action to the district court and, following discovery, filed a motion for summary judgment.
Granting the motion, the district court determined that all of the statements in the July 17, 2008, broadcast were literally true and that the statements, taken together, did not evince a false implication endorsed by WCHS-TV8. The court rejected Tomblin’s false light claim because the footage used of Tomblin in the broadcast simply reflected Noreika’s effort to get both sides of the story. Finally, the court found that Tomblin’s emotional distress claim failed as a matter of law because the broadcast was not “extreme and outrageous” and was not intended to cause Tomblin emotional distress or aired in such a way that it unreasonably endangered Tomblin’s physical safety.
From the district court’s order granting summary judgment, Tomblin filed this appeal, claiming that the district court inappropriately resolved questions of fact against her.
*209 Jl
Tomblin argues that the broadcast was capable of multiple interpretations and could lead a reasonable viewer to believe, falsely, that an adult at the daycare sexually abused a child. She also contends that she presented evidence sufficient to allow a jury to find actual malice on the part of WCHS-TY8, pointing to the fact that No-reika, the reporter, possessed the DHHR report which stated that the incident allegedly involved only a four-year-old boy improperly touching a four-year-old boy, as distinct from an adult abusing a child.
WCHS-TV8 contends that the district court properly entered summary judgment because the statements made in the broadcast were all true in that the mother did in fact allege that her child had been sexually abused. WCHS-TV8 also argues that Tomblin failed to proffer evidence of actual malice, as required to overcome the station’s privilege in reporting matters of public concern.
Having reviewed the record carefully, including a copy of the broadcast, we conclude that there are numerous material statements that are capable of multiple interpretations and that a jury could conclude that the broadcasts defamed Tomblin and placed her in a false light.
First, WCHS-TV8 published the statement that “this daycare ... abused her trust and her child.” (Emphasis added). Yet, the station acknowledges that the daycare did not abuse a child. It understood that one four-year-old boy may have abused another four-year-old boy. But it had no evidence that the daycare center or any of its employees abused the boy. WCHS-TV8 rationalizes its publication of the broadcast statement by arguing that the daycare abused the child because the daycare was legally responsible for the abuse. This is also the position taken by Noreika, the reporter, to justify her reporting of the incident. In her deposition she explained, “The daycare did not abuse the child,” but “what happens in the daycare, no matter who does anything, is the responsibility of the daycare.” This rationalization adopted by both WCHS-TV8 and Noreika does not, however, transform a misleading statement into a true statement. A reasonable jury could find that this statement was defamatory, inasmuch as there is material difference between a daycare worker actually abusing a child in his or her care, and a daycare worker negligently supervising a child such that he or she is ultimately responsible for one child’s assault of another child.
Second, throughout the broadcast, WCHS-TV8 referred to the incident as “sexual abuse.” Yet, the term sexual abuse did not appear in the DHHR report, and there is a genuine issue as to whether the term “sexual abuse” would be misleading to the public in this context. WCHS-TV8 acknowledges that the assault allegedly involved one child placing his finger in another child’s rectum and grabbing the other child’s genitals. Because this is an unwanted touching of a sexual organ, it argues that the incident may be characterized as a form of sexual abuse. Yet, the DHHR did not consider it sexual abuse. It did not refer to the incident as an incident of sexual abuse, and it stated, in its subsequent report, “No information was provided that [the four-year-old assaulting child] was sexual, acted out upon or acted out himself while at Kim’s Kids Daycare Center.” The report also included statements from a staff worker, who was familiar with that child, that “she ha[d] not seen any sexual acting out by [the four-year-old assaulting child]. He has not displayed any sexual behaviors. He did not display any age consistent [sic] sexual behaviors at the center.” Moreover, in the context of a *210 report about a daycare center involving the supervision of young children, the term “sexual abuse” is especially alarming and could reasonably lead a rational jury to conclude that the term used in that context indicated that an adult at the daycare sexually abused a child. This issue is thus an appropriate one for jury resolution, not summary judgment.
Third, the broadcast stated numerous times that the daycare was accused of both abuse and neglect, creating a genuine issue of material fact as to whether the broadcast was suggesting that the daycare did more than negligently supervise children; it also abused children. In the introductory statement to the broadcast, the anchor stated “the state is investigating a daycare” amidst “serious allegations of abuse and neglect.” From this opening announcement that there was both abuse and neglect at the daycare, a reasonable jury could conclude that the term “abuse” implied that an adult actually abused a child, because the term “neglect” would be sufficient to indicate the simple lack of supervision. This could be significant in the context of the summary given by Noreika, the reporter, who stated that the mother “alleges that her son was sexually abused while at Kim’s Kids Daycare. She also says that the daycare workers smoke around children and engage in other inappropriate behavior.” Noreika’s statement that daycare workers “engage in other inappropriate behavior” could lead a reasonable jury to conclude that the daycare was not only neglectful, its workers were sexually abusing children in their care.
Fourth, we have reviewed the broadcast as a whole and conclude, when taken as a whole, there could be a question of fact as to whether the broadcast produced a false “implication, innuendo or insinuation” about the daycare. See Crump v. Beckley Newspapers, Inc., 173 W.Va. 699, 320 S.E.2d 70, 77 (1983). The broadcast repeatedly referenced the sexual abuse of a child in the context of a daycare, potentially creating the impression that a daycare worker abused a child. The seriousness and drama with which the broadcast was made, also indicate, something far more serious than the failure to prevent the assault of one four-year-old boy by another.
Finally, on the question of whether WCHS-TV8 deliberately or recklessly conveyed a false message to sensationalize the news and thus to provide factual support for a finding of malice, there are disputed facts. It is undisputed that the broadcast omitted the most important exculpatory detail, that the incident involved one four-year-old boy inappropriately touching another four-year-old boy. Additionally, without disclosing that fact, the broadcast did not simply report the mother’s allegation but emphasized the seriousness of the story. When introducing the segment, the anchor stated that “some serious allegations of abuse and neglect have the state keeping a closer eye on the Barboursville daycare.” (Emphasis added). While Noreika does assert in her deposition that the child’s mother told her that “while at the daycare her child had been sexually abused,” the mother in the same context explained her accusation by providing Noreika with a copy of the DHHR report, which gave the details that eliminated the false innuendo. Yet, WCHS-TV8 went on to report the seriousness of the allegations that a mother claimed that her child had been sexually abused without reporting the known details contained in the DHHR report. Tomblin argues effectively that because the reporter knew the allegations of abuse concerned a child on child contact and yet aired a report that implied that an adult abused a child, a reasonable jury could find malice.
*211 Even though WCHS-TV8 has a qualified privilege to make a “fair comment on matters of public concern,” Crump, 320 S.E.2d at 79; Havalunch, Inc. v. Mazza, 170 W.Va. 268, 294 S.E.2d 70, 75-76 (1981), that qualified privilege is defeated if the speaker acts with malice. Malice requires that Tomblin prove that Noreika have “a subjective appreciation at the time of publication that either (1) the defamatory statement is false, or (2) the defamatory statement is being published in reckless disregard or whether it is false.” Hiner-man v. Daily Gazette Co., Inc., 188 W.Va. 157, 423 S.E.2d 560, 573 (1992) (emphasis omitted).
If the disputed facts were resolved in Tomblin’s favor, the record would provide evidence from which a jury could infer that Noreika acted with reckless disregard of the truth. While she had a copy of the DHHR report at the time of the broadcast which indicated that a boy was accused of improperly touching another boy, she chose to air a news report suggesting that an adult abused a child, despite her knowledge that there was no allegation of adult on child abuse. “Where the defendant finds internal consistencies or apparently reliable information that contradicts its libelous assertions, but nevertheless publishes those statements anyway, the New York Times actual malice test can be met.” Schiavone Const. Co. v. Time, Inc., 847 F.2d 1069, 1090 (3d Cir.1988) (citing Curtis Publ’g Co. v. Butts, 388 U.S. 130, 161 n. 23, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967)).
For the reasons given, we conclude that factual questions exist in this case, precluding the entry of summary judgment on Tomblin’s defamation and false light claims.
We also conclude that these factual issues preclude entry of summary judgment on the claim for intentional infliction of emotional distress, although the question is substantially closer. Nonetheless, we must be mindful that leveling false accusations of sexual abuse at a daycare is, perhaps, the most outrageous accusation that one could make against that type of institution, which is charged with children’s well-being. We have previously acknowledged that the publication of a defamatory statement can be outrageous. When a newspaper named a research scientist as a suspect in mailing anthrax-laced letters without regard for the truth of the accusation, we held that the publisher’s conduct rose to the level of outrageous behavior required to establish a claim of intentional infliction of emotional distress under Virginia law. See Hatfill v. New York Times Co., 416 F.3d 320, 336 (4th Cir.2005). In this case, the accusations made by WCHS-TV8 could similarly be found to be extreme and likely to create a great public reaction. Because Tomblin has alleged that the station aired this accusation without regard for the truth of the matter asserted, a jury could find that WCHS-TV8 recklessly inflicted emotional distress on Tomblin.
Accordingly, we likewise vacate the summary judgment on that claim and remand for further proceedings.
Ill
Tomblin also challenges the district court’s ruling striking out portions of affidavits she filed from various members of the community who noted that, after watching the broadcast, they believed that a daycare worker abused a child. Tomblin argues that without this evidence, she could not show that one parent pulled her child out of Kim’s Kids Daycare because she thought the broadcast meant that an employee had committed sexual abuse or that people in the Barboursville community shunned Tomblin after the broadcast and speculated as to whether “an adult *212 abused a child.” The district court’s ruling, however, does not go so far as to prevent Tomblin from making her case. The district court only struck from the affidavit expressions of the affiants’ subjective impressions about the broadcast, concluding that such impressions would not be helpful to the trier of fact because they would be duplicative of those which could be reached by the jury. The court struck only the inadmissible material and did not prevent Tomblin from using other portions of the affidavits. It actually specified that “other statements contained within the affidavits referring to the state of Mrs. Tom-blin’s health or the withdrawal of children from the daycare are admissible.” Moreover, witnesses could surely testify to the understanding about the daycare that they actually took from the broadcast while watching it. As it stands, we find that the district court reached an appropriate balance between disallowing unhelpful opinion testimony and allowing Tomblin to prove her case. On remand, however, the district court is free to revisit this evidence’s evidentiary value as discovery proceeds. At this moment, we do not conclude that the district court abused its discretion.
Tomblin also challenges the district court’s decision to strike a portion of an expert report that gave an opinion on how a reasonable viewer would interpret the July 17, 2008 broadcast. The court refused to admit the report on the basis that the expert had not actually watched the broadcast. Because the expert had not seen the video, the court reasoned, his opinions were without proper foundation.
Although the expert did not watch the broadcast prior to preparing his initial report (dated August 24, 2009), he made it very clear in his final report (dated September 3, 2009) that he had seen the broadcast. Moreover, both reports were filed several months before the district court issued its ruling on the report. Accordingly, we reverse the district court’s evidentiary ruling with respect to the expert’s report. But again, on remand the district court is free to review the expert report in its broader context.
IV
For the reasons given, the summary judgment entered by the district court is vacated, and the case is remanded for further proceedings. The district court’s ruling on the community members’ affidavits is affirmed, and the district court’s ruling on the expert report is reversed.

IT IS SO ORDERED.